UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK A. VAUGHN,<br><br>            Plaintiff,<br><br>     v.<br><br>TERAN,<br><br>            Defendant. | Case No.  1:17-cv-00966-HBK<br><br>ORDER GRANTING IN PART PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT[1]<br><br>(Doc. No. 99) |

Pending before the Court is Plaintiff Mark A. Vaughn's[2] Motion to Enforce Settlement Agreement, filed May 17, 2023.  (Doc. No. 99, "Motion").  Plaintiff's attorney, Ken Karan, asserts a claim for breach of the settlement agreement reached in this case, based on the California Department of Corrections and Rehabilitation ("CDCR") mailing a settlement check for $225,000.00 directly to Plaintiff Vaughn, a recently released prisoner, rather than to Karan. Vaughn subsequently absconded with the settlement funds and has not paid Karan for his costs and substantial legal services.

The Parties have submitted extensive briefing on the issue.  On May 19, 2023, Karan filed

---

[1] Both parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c)(1).  (Doc. No. 118).

[2] Because the dispute at issue in the instant Motion is between Plaintiff's counsel and the California Department of Corrections and Rehabilitation, rather than Plaintiff and Defendant, the Court refers hereinafter to the real parties in interest accordingly.

1

a Declaration in Support of his Motion, attaching several exhibits. (Doc. No. 100). On July 5, 2023, Karan filed a Supplement and additional Declaration in Support of his Motion, including several additional exhibits. (Doc. No. 104). On July 19, 2023, CDCR filed an Opposition and on July 20, 2023, Karan filed a Reply. (Doc. Nos. 107, 108). On December 7, 2023, the Court held a status conference on the case and thereafter directed the Parties to submit additional briefing on specified issues. (Doc. Nos. 114, 116). On January 30, 2024, Karan filed a Supplemental Brief. (Doc. No. 121). On February 13, 2024, CDCR filed an Opposition, and on February 20, 2024, Karan filed a Reply. (Doc. Nos. 122, 123). For reasons set forth below, the Court grants Karan's Motion in part.

## BACKGROUND

Plaintiff, a former prisoner, was represented by retained counsel, Ken Karan. Plaintiff's civil rights complaint asserted an Eighth Amendment deliberate medical indifference and state medical negligence claims against Defendant Teran, a Nurse then employed by the California Department of Corrections and Rehabilitation ("CDCR"). (*See* Doc. No. 11 at 6). On July 22, 2022, the eve of trial,[3] the Parties held a lengthy[4] settlement conference before the undersigned, reached an agreement, and placed the terms of the settlement on the record, including a monetary payment of $225,000.00. (*See* Doc. No. 84). On November 3, 2022, the Parties filed a stipulation of dismissal, reflecting their resolution of Plaintiff's claims. (Doc. No. 97). The Parties stipulated that this Court would "retain jurisdiction of the matter limited to enforcement of the settlement agreement until the settlement agreement is performed." (*Id*. at 2). The Court ordered Defendant to file periodic status reports until the payment under the settlement agreement is made. (Doc. No. 98). Under the settlement agreement, signed and submitted by Plaintiff's counsel to Defense counsel on November 2, 2022, CDCR was to make "a good faith effort" to complete payment within 180 days, thus the last day to perform the settlement agreement was

---

[3] A jury trial was scheduled to commence on August 9, 2022. (Doc. No. 78).

[4] The Court's records reflect the settlement conference lasted approximately five hours. During the settlement conference a brief recess was held for Plaintiff's counsel to contact certain lien holders. Critical to the settlement was Plaintiff's satisfaction as to the amount he would receive after payment of his attorney fees and payment of certain liens and assurances, that due to his release, the settlement funds would not be subject to restitution.

2

1 | May 1, 2023. (*See* Doc. No. 100-1 at 9 ¶ 22; Doc. No. 99 at 2).

2 | After Defense counsel, Mr. Roman, failed to file any status reports concerning payment of the settlement award, Plaintiff's counsel, Mr. Karan, wrote to Roman on February 1, 2023 seeking an update. (Doc. No. 100-1 at 12). Mr. Roman responded, "I have followed up on the status of the settlement a couple of times, but I have not been able to get any specific information." (*Id.*). Mr. Karan replied, seeking a more detailed response from Mr. Roman, but Roman did not respond. (*Id.* at 14). On April 21, 2023, Mr. Karan again wrote to Mr. Roman seeking an update on the status of payment. (*Id.* at 16). Mr. Roman responded, "I just followed up with the Finance Office last week and they indicated the check had been processed. If you have not received it, you should receive it in the next week. Please let me know once you get it." (*Id.*). On May 3, 2023, Mr. Karan wrote to Mr. Roman stating his position that CDCR was in breach of the settlement agreement because it had failed to make payment within 180 days. (*Id.* at 18). Mr. Roman responded:

> Per my previous email it was my understanding that the settlement payment was already sent.
>
> I followed up and confirmed that the check was sent on February 15, 2023. I was told the check was sent to the address provided on the Payee Data Record. The CDCR Office of Legal Affairs is following up to ensure the check has not been cashed. I will determine what our options are at that point.
>
> Have you spoken with Mr. Vaughn to ensure that he has not received the check?

*Id.* After further back and forth, on May 5, 2023 Mr. Roman confirmed for the first time that the check was sent directly to Plaintiff Mark Vaughn's address and that the check was cashed in March. (*Id.* at 20). Mr. Karan advised the Court that Mr. Vaughn had ceased contact with him and had not paid his attorney's fees or any of his debts.

Mr. Karan thereafter filed the instant Motion to Enforce the Settlement Agreement, arguing that CDCR committed various contractual torts in mailing the settlement check to Vaughn, including violating the covenant of good faith and fair dealing, inducement to breach of contract, and intentional interference with contractual relations. (Doc. No. 99 at 5-8). Karan initially sought $104,859.21 in damages, including fees, costs, and "other obligations incurred by

1  Plaintiff." (*Id*. at 8). In an Amended Motion, however, Mr. Karan sought the full $225,000 as

2  relief, because certain commercial lien holders would hold him responsible for Mr. Vaughn's

3  default on his obligations. (Doc. No. 100 at 1-2).

## PARTIES' POSITIONS

The Parties' dispute centers on whether CDCR's actions in sending the settlement check to Plaintiff violated the express or implied terms of payment provided under the settlement agreement. The agreement states in pertinent part:

> 3. CDCR shall pay $225,000.00 (Two Hundred Twenty-Five Thousand Dollars and No Cents) to Plaintiff as complete resolution of all claims arising out of or relating to the above lawsuit.
>
> 4. Plaintiff shall sign a voluntary dismissal with prejudice under Fed. R. Civ. P. 41(a)(1)(A)(ii), which the Defendant shall file immediately. **Plaintiff and Plaintiff's attorney agree to execute Payee Data Forms in a form satisfactory to the attorney for the Defendants and to deliver such completed Payee Data Forms to the attorney for the Defendants**. Each party to this Agreement shall cooperate fully in execution of any and all other documents and in any additional acts that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement. The voluntary dismissal and the Payee Data Form will be delivered to defense counsel within fifteen (15) calendar days of this Agreement being fully executed.
>
> . . .
>
> 21. If the settlement amount exceeds the other payments and obligations referred to in the paragraph 20 above, the excess balance, if any, shall be paid to Plaintiff's inmate trust account, if incarcerated by CDCR at the time the settlement payment is made.

(Doc. No. 100-1 at 4 ¶¶ 3-4, 9) (emphasis added).

After holding a status conference on December 7, 2023, the Court directed the parties to brief the following issues of contract interpretation to guide the Court's resolution of the Motion: (1) whether the manner of payment of the settlement funds was a material term of the Settlement Agreement; (2) whether the Settlement Agreement is silent or ambiguous as to the manner of payment of the settlement funds, and if so; (3) what extrinsic evidence, if any, the Court should consider in supplying a missing term or interpreting the settlement agreement's language regarding payment of those funds.

////

4

**A. Mr. Karan's Position**

Mr. Karan contends that (1) the manner of payment of the settlement funds was a material term of the Settlement Agreement ("SA" or "Agreement"), (2) that the SA is silent or ambiguous as to the manner of payment of the settlement funds, and (3) offers extrinsic evidence to support his position that the Agreement should be interpreted as directing payment to his client trust account, rather than to Plaintiff's home address.

Karan contends the SA is silent or ambiguous as to the manner of payment because it does not specify where or how settlement funds are to be paid. (Doc. No. 121 at 4). According to Karan, the statement in paragraph 3, "CDCR shall pay $225,000 to Plaintiff" does not specify that payment was to be made directly to Plaintiff by sending him a check, or otherwise provide the manner of payment. (*Id*.). Rather, it only indicated the amount of the award being made to Plaintiff. (*Id*.). As Karan points out, "[t]he word 'payable [to]' does not appear in the agreement." (Doc. No. 108 at 2). Therefore, paragraph 3 is either silent or ambiguous as to the manner of payment. Moreover, given that paragraph 4 specifies that <u>both</u> Plaintiff and Plaintiff's attorney are to provide defense counsel with Payee Data Forms, and because both Karan and Vaughn did submit Payee Data Forms, both the Agreement itself and communication with defense counsel suggested at a minimum that payment could be directed to either plaintiff *or* his attorney. (*Id*. at 5). Finally, Karan points to his communications with Roman after the payment issue was discovered. On April 22, 2023, Roman wrote, "I just followed up with the Finance Office last week and they indicated the check had been processed. If *you* have not received it, *you* should receive it in the next week. Please let me know once *you* get it." (Doc. No. 100-1 at 16) (emphasis added). This tends to support the inference, Karan argues, that Roman himself believed payment would be sent to Karan, rather than to Vaughn, thus CDCR's failure to do so was contrary to the Parties' intent. (Doc. No. 108 at 3).

As extrinsic evidence of the Parties' intent, Plaintiff's counsel points to his course of dealings with CDCR during more than 20 years of handling prisoner civil rights cases. (Doc. No. 121 at 7). Counsel states that in each of the nine cases he has handled, payment was made to his client trust account. Counsel attaches copies of the agreements in seven of those cases to his

5

Supplemental Brief, each of which specifies that payment is to be made to the attorney's client trust account. Counsel cites the pertinent language from those agreements, which include the following payments clauses:

> "Within 150 days from the date that Defendants' counsel receives the settlement agreement, and payee data records for Plaintiff and his attorney, payment in the amount of $30,000 shall be made on behalf of Defendants by check payable to Steven Martinez and Ken Karan, his attorney of record." (Settlement Agreement in *Martinez v. State of California*, CAED Case No. 1:07-CV-00996-AWI-DLB)
>
> "As requested by Plaintiff, CDCR will make the check payable to Law Office of Ken I. Karan." (Settlement Agreement in *Garza v. Alvara*, CAED Case No.: 1:15-cv-00234 DAD-SKO)
>
> "As requested by Plaintiff, CDCR will make the check payable to the Law Office of Ken I. Karan." (Settlement Agreement in *Mozingo v. Fisher, Jr.*, CAED Case No. 1:15-cv-00633 LJO-BAM)
>
> "Because Plaintiff requests that payment be made to Plaintiff's counsel, Law Office of Ken I. Karan Trust Account, that person or entity must also complete a Payee Data Form." (*Munoz v. CDCR*, CAED Case No.: 1:16-CV-01103-JLT-BAK)

(*Id*. at 7-8). Karan also states that in his course of dealings with CDCR, the agency "does not negotiate the terms" of its settlement agreements, thus he "relied on the 23-year history of CDCR mailing settlement checks to his office made payable to his client trust account and the past negative responses to counsel's attempts to modify the agreements" when he accepted the agreement as written. (*Id*. at 3-4). Karan also contends that the general practice in personal injury litigation, where an entity is paying to settle a claim, is "to always let the attorney determine where the funds should be disbursed to avoid liability for mistakes by the entity." (*Id*. at 6). Karan argues that this general "usage of trade" tends to support the inference that CDCR would do likewise here and direct payment to Karan's client trust account. (*Id*.).

**B. CDCR's Position**

In its Opposition to Karan's supplemental briefing, CDCR agrees that the manner of payment is a material term in the Settlement Agreement. (Doc. No. 122 at 2). CDCR contends, however, that the terms of payment were neither silent nor ambiguous in the Agreement, pointing

6

1 to paragraphs 3 and 21[5]. (*Id*. at 2-3). CDCR notes that because Plaintiff was in custody in Riverside County at the time of the settlement conference, it was anticipated that he could be in CDCR custody at the time the settlement payment was issued. Thus, the Agency included paragraph 21 of the Agreement, specifying that certain deductions would be made from the settlement amount "if [Plaintiff is] incarcerated at the time the settlement payment is made." (*Id*. at 2).

CDCR argues that the Agreement's language regarding manner of payment in the event Plaintiff was not in custody was unambiguous. The Agreement states, "CDCR shall pay $225,000 to Plaintiff as complete resolution of all claims arising out of or relating to the above lawsuit" and the term Plaintiff is defined in paragraph 1 of the agreement as "Mark A. Vaughn." (Doc. No. 122 at 2). CDCR states that "CDCR settlements are regularly paid to inmates and/or parolees without the inclusion of" language directing payment to an attorney's trust account. (*Id*. at 3). Thus, the mere fact that no such language was included in the Agreement does not render it ambiguous. (*Id*.). Further, CDCR points out that Karan did not request any language specifying the manner of payment, despite reviewing multiple drafts, thus he is presumed to have agreed to the language therein. (*Id*.).

As to the extrinsic evidence proffered by Mr. Karan, CDCR argues it is irrelevant and inadmissible under the terms of the Settlement Agreement, which states that, "[n]othing other than this Agreement shall be relevant or admissible to supplement or vary any of its terms and provisions." (*Id*.). Even accepting the prior agreements as evidence, CDCR argues they contradict Karan's position. In those prior cases, CDCR paid the settlement according to the terms in the relevant agreement (i.e. to the attorney's trust account). Meanwhile, here, pursuant to an agreement that specified "CDCR shall $225,000.00 to Plaintiff . . ." that is precisely what CDCR did. (*Id*.). Nor is it aberrant, CDCR argues, for the agency to pay settlements directly to an inmate, even when represented by counsel. (*Id*. at 4). CDCR cites a case settled less than a year after the instant matter, in which CDCR paid the settlement directly to a represented inmate.

---

[5] Notably, CDCR makes no mention of paragraph 4 and its reference to collecting a Payee Data Form from Plaintiff's attorney.

7

1  (*Id.*). Thus, CDCR argues that to the extent there was any ambiguity in the Settlement
2  Agreement, which it denies, the extrinsic evidence does not support an inference that payment
3  was to be made to Mr. Karan. (*Id.*).

### C. Discussion

#### a. Jurisdiction

Neither party contends that the Court lacks jurisdiction to enforce the Settlement Agreement. As a general rule, when a district court dismisses an action with prejudice, federal jurisdiction ends and a dispute arising under the settlement agreement is a separate contract dispute that requires its own independent basis for jurisdiction. *Kelly v. Wengler*, 822 F.2d 1085, 1094 (9th Cir. 2016). However, federal courts do have the authority to enforce a settlement agreement while the litigation is still pending or when the settlement agreement is referenced in the dismissal order or the court has retained jurisdiction to enforce the agreement. *In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994); *Kelly*, 822 F.3d at 1085.

In the Parties' November 3, 2022 stipulation of dismissal, the Parties agreed that this Court would "retain jurisdiction of the matter limited to enforcement of the settlement agreement until the settlement agreement is performed." (Doc. No. 97. at 2). The Court in its dismissal order noted that it had retained jurisdiction over the settlement and ordered Defendant to file periodic status reports until the payment under the settlement agreement is made. (Doc. No. 98). Thus, the Court has ancillary jurisdiction to enforce the settlement agreement. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 380–82 (1994).

#### b. Breach of Contract

An agreement to settle a federal case is a contract governed by the applicable state law. *Botefur v. City of Eagle Point,* 7 F.3d 152, 156 (9th Cir.1993) ("The interpretation of a settlement agreement is governed by principles of state contract law, ... even where a federal cause of action is settled or released" (citations and quotation marks omitted)). Under California law, to prevail on a breach of contract claim, a plaintiff must demonstrate: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages to the plaintiff. *D'Arrigo Bros. of California v. United Farmworkers of*

*Am*., 224 Cal. App. 4th 790, 800 (2014) (citations omitted).

### 1. Valid Contract

A threshold question here concerns whether there was an agreement between Plaintiff's counsel and CDCR that would give counsel standing to sue to enforce the Agreement. The Agreement states:

> This Settlement Agreement (Agreement) is entered into between Mark A. Vaughn (Plaintiff) and the California Department of Corrections and Rehabilitation (CDCR) on behalf of Defendant. The Plaintiff, CDCR and the Defendant are collectively referred to as 'The Parties.' By signing this Agreement, the Parties agree as follows . . .

(Doc. No. 100-1 at 4). Plaintiff's counsel is not listed among the parties to the agreement. Thus, facially the Settlement Agreement was not an express contract between Plaintiff's counsel and CDCR. However, Plaintiff's counsel was a co-signatory to the Agreement and he is specifically discussed in Paragraph 4 ("Plaintiff and Plaintiff's attorney *agree* to execute Payee Data Forms in a form satisfactory to the attorney for the Defendants . . .") (emphasis added), raising the question whether Karan was an intended third-party beneficiary to the settlement agreement. (Doc. No. 100-1 at 4).

In California, a third party may qualify as a beneficiary under a contract when the contracting parties intend to benefit the third-party and the intent appears in the terms of the agreement. *See Jensen v. U-Haul Co. of Cal*., 18 Cal. App. 5th 295, 301 (2017). In *Goonewardene*, the California Supreme Court adopted a three-part test to determine whether a contract intends to benefit a third-party beneficiary. *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817 (2019). The *Goonewardene* test analyzes (1) whether the third-party would in fact benefit from the contract; (2) whether a motivating purpose of the contract was to provide a benefit to the third-party; and (3) whether permitting a third-party to bring its own breach of contract action against a contracting party is consistent with the objectives and reasonable expectations of the contract. *See Goonewardene*, 6 Cal. 5th at 830. For a third-party action to proceed, all three elements must be satisfied. *See id*.

Here, the parties have not briefed the specific issue of standing, however based on a

review of the Agreement and the parties' briefing on enforcement of the Settlement Agreement, the Court finds that Plaintiff's counsel was an intended third-party beneficiary to the Agreement. As to the first *Goonewardene* factor, it is clear that Counsel was a material beneficiary under the Settlement Agreement since as he advised the Court at an informal discovery hearing on December 19, 2023, Counsel's agreement with Vaughn was to take a 35% fee of the negotiated settlement (plus costs, which he indicated were roughly $25,000), and it would have been obvious to CDCR that Karan would receive a financial benefit from performance of the Settlement Agreement. Looking to the second *Goonewardene* factor, a "motivating purpose" of the Agreement was to benefit Karan, since he negotiated the settlement amount to include a sufficient award to satisfy his client's expectations and to pay his own attorney's fees. Thus, Karan satisfies the second *Goonewardene* factor. Finally, permitting Karan to bring his own breach of contract action is consistent with the objectives and reasonable expectations of the contract. Karan expected to receive a substantial financial benefit for settling the case, in this instance $78,750, plus roughly $25,000 in costs, thus to the extent CDCR failed to perform its obligations under the contract, it would be reasonable to anticipate that Karan would bring a breach of contract action to enforce the settlement agreement.

Thus, because Karan meets all three factors of the *Goonewardene* test, the Court finds he is a third-party beneficiary to the Settlement Agreement and could properly bring an action for breach of contract.

### 2. Plaintiff's Performance Under the Contract

Under the terms of the settlement agreement, Plaintiff was to "sign a voluntary dismissal with prejudice under Fed. R. Civ. P. 41(a)(1)(A)(ii)" and deliver the voluntary dismissal and Payee Data Forms completed by Plaintiff and his counsel to defense counsel. (See Doc. No. 100-1 at 4 ¶ 4). In exchange, CDCR was to pay Plaintiff $225,000.00. It is uncontested that Plaintiff and his counsel performed under the contract. The Parties entered a stipulation of dismissal with prejudicial on November 3, 2022 (Doc. No. 97), and CDCR has never disputed that Plaintiff and Karan delivered completed Payee Data Forms to him as required by the Agreement.

////

### 3. Defendant's Breach

The crux of the instant Motion concerns whether CDCR breached the Settlement Agreement by delivering a settlement check directly to Plaintiff Vaughn rather than sending it to Plaintiff's counsel. In order to answer that, the Court turns back to the questions it posed to the Parties for supplemental briefing: (1) whether the manner of payment of the settlement funds was a material term of the Settlement Agreement; (2) whether the Settlement Agreement is silent or ambiguous as to the manner of payment of the settlement funds, and if so; (3) what extrinsic evidence, if any, the Court should consider in supplying a missing term or interpreting the settlement agreement's language regarding payment of those funds. The Parties agreed that the manner of payment was a material term of the Agreement but disagreed on the other two questions.

### i. Whether the Terms of Payment in the Agreement are Silent or Ambiguous

Contract language is ambiguous when it is susceptible to two or more reasonable constructions. *E.M.M.I. Inc. v. Zurich American Ins. Co*. 32 Cal.4th 465, 470 (2004) "'[W]here the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract.'") *Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534, 544 (1996).

Contract law allows admission of extrinsic evidence "to resolve an ambiguity," even when the contract is an integrated agreement. *WYDA Assocs. v. Merner*, 42 Cal.App.4th 1702, 1710 (1996); *see also* Cal. Code Civ. Proc § 1856(g); *Winet v. Price*, 4 Cal.App.4th 1159, 1165 (1992). Extrinsic evidence may be offered both to explain an obviously ambiguous term and to reveal a latent ambiguity. *Pac. Gas & E. Co. v. G.W. Thomas Drayage etc. Co*., 69 Cal.2d 33, 37 (1968).

In reviewing the Agreement, the arguments of the Parties, and the extrinsic evidence presented by both sides, the Court finds that the payment terms of the SA are either silent or ambiguous. By itself, Paragraph 3 is silent as to the manner of payment of the monetary settlement. The Court agrees with Mr. Karan that the statement "CDCR shall pay $225,000.00 . . . to Plaintiff" does not address the *manner* of payment. *See Indep. Quality Foods, LLC v.*

*Kansas City Steak Co., LLC*, 585 S.W.3d 855, 861 (Mo. Ct. App. 2019) ("the reference to 'payment terms' would normally be read to refer to such matters as the timing of payment . . . and the manner of payment (such as by wire transfer, cashier's check, or by other means of payment").

The agreement does not state to whom any settlement check will be made payable, nor where it will be sent.  Thus, Paragraph 3 is effectively silent as to the manner of payment.  Even assuming *arguendo* that Paragraph 3 is unambiguous in directing the $225,000 payment "to Plaintiff," as CDCR contends, this reading is untenable in light of the next paragraph in the Settlement Agreement.

Paragraph 4 states that both "Plaintiff and Plaintiff's attorney agree to execute Payee Data Forms in a form satisfactory to the attorney for the Defendants and to deliver such completed Payee Data Forms to the attorney for the Defendants."  (Doc. No. 100-1 at 4 ¶ 4).  CDCR does not address in any of its briefing the most obvious meaning of this provision, which is that Plaintiff's counsel was a "Payee" under the settlement agreement.  *See, e.g., Holt v. MacArthur*, 2014 WL 940327, at *7 (S.D. Cal. Mar. 10, 2014) (discussing settlement agreement between CDCR and inmate, in which plaintiff requested the settlement check be sent to his father; defense counsel advised plaintiff "[i]f [he] want[s] the settlement check to go to [his] father, [his father] will need to sign the Payee Data Form and he will need to provide his social security number."); *see also Burghardt v. Franz*, 2023 WL 3440323, at *1 (N.D. Cal. Apr. 10, 2023) (noting defense counsel's comment in placing settlement terms on the record that "Plaintiff shall also complete a payee data form to enable payment and credit towards his restitution obligations.").  Thus, Paragraph 4 suggests that the settlement payment would be made out to both Plaintiff and Mr. Karan, consistent with at least one of Mr. Karan's prior settlements.  (*See* Doc. No. 121-1 at 12 ¶ 3) ("Within 150 days from the date that Defendants' counsel receives the settlement agreement, and payee data records for Plaintiff and his attorney, payment in the amount of $30,000 shall be made on behalf of Defendants by check payable to Steven Martinez and Ken Karan, his attorney of record.").

Somewhat confusingly, Paragraph 4 also states, "The voluntary dismissal and the Payee

12

1  Data *Form* will be delivered to defense counsel within fifteen (15) calendar days of this
2  Agreement being fully executed." (emphasis added).  This reference introduces an additional
3  layer of ambiguity, concerning whether both Plaintiff and his attorney were to complete Payee
4  Data Forms.  The most reasonable reading of this provision is that the latter reference to Payee
5  Data Form (singular) was a scrivener's error, while the prior two references to Payee Data Forms
6  (plural) were correct.  In any event, this only bolsters the Court's conclusion that Paragraphs 3
7  and 4 together reflect a Settlement Agreement that was ambiguous as to the manner of payment,
8  including whether it was to be made out to Plaintiff, his attorney, or both.  *See* E.*M.M.I. Inc.* 32
9  Cal.4th at 470.  Thus, the Court finds the Agreement was at least "reasonably susceptible" to the
10 meaning ascribed by Mr. Karan—that the settlement funds were to be paid to him, to then be
11 disbursed to Mr. Vaughn.  *See Winet*, 4 Cal.App. 4th at 1165.  Thus, the Court may look to
12 extrinsic evidence to resolve the ambiguity in the Agreement.  *See id*. ("[i]f in light of the
13 extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation
14 urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the
15 contract.")

          **ii.  What Extrinsic Evidence is Relevant to Supply a Missing or Ambiguous Term of the Settlement Agreement**

17       Under California law, admissible extrinsic evidence to resolve ambiguity in a contract
18 includes: (1) the circumstances under which the contract was made and the matter to which it
19 relates (Cal. Civ. Code § 1647); (2) the parties' statements during negotiations and communicated
20 intent (*Heston v. Farmers Ins. Group*, 160 Cal.App.3d 402, 412 (1984)); (3) the parties' "course
21 of dealing" and "course of performance," including pre-dispute conduct (Cal. Code Civ. Proc. §
22 1856(c); *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal.4th 375, 393 (2008)); and (4)
23 usage of trade (*Id*.; *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205
24 Cal.App.3d 442, 451 (1988) ("industry custom binds those engaged in the business even though
25 there is no specific proof that the particular party to the litigation knew of the custom") (citation
26 omitted)).  In supplying a missing or ambiguous term, "'[t]he usual and reasonable terms found in
27 similar contracts can be looked to, unexpressed provisions of the contract may be inferred from

13

the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement.'" *Hennefer v. Butcher*, 182 Cal.App.3d 492, 500 (1986).

As discussed above, Plaintiff's counsel points to his course of dealings with CDCR over more than 20 years of handling prisoner civil rights cases as extrinsic evidence of the manner of payment intended here. (Doc. No. 121 at 7). Counsel states that in each of the nine cases he has handled, the check was sent to counsel and made out to either the attorney's client trust account or to counsel and client jointly. Counsel attaches copies of the agreements in seven of those cases to his Supplemental Brief, each of which specifies the manner of payment. Counsel cites the pertinent language from those agreements, which include the following payments clauses:

> "Within 150 days from the date that Defendants' counsel receives the settlement agreement, and payee data records for Plaintiff and his attorney, payment in the amount of $30,000 shall be made on behalf of Defendants by check payable to Steven Martinez and Ken Karan, his attorney of record." (Settlement Agreement in *Martinez v. State of California*, CAED Case No. 1:07-CV-00996-AWI-DLB)
>
> "As requested by Plaintiff, CDCR will make the check payable to Law Office of Ken I. Karan." (Settlement Agreement in *Garza v. Alvara*, CAED Case No.: 1:15-cv-00234 DAD-SKO)
>
> "As requested by Plaintiff, CDCR will make the check payable to the Law Office of Ken I. Karan." (Settlement Agreement in *Mozingo v. Fisher, Jr.*, CAED Case No. 1:15-cv-00633 LJO-BAM)
>
> "Because Plaintiff requests that payment be made to Plaintiff's counsel, Law Office of Ken I. Karan Trust Account, that person or entity must also complete a Payee Data Form." (*Munoz v. CDCR*, CAED Case No.: 1:16-CV-01103-JLT-BAK)

(*Id*. at 7-8). Karan also asserts that the general practice in personal injury litigation, where an entity is paying to settle a claim, is "to always let the attorney determine where the funds should be disbursed to avoid liability for mistakes by the entity." (*Id*. at 6). Karan argues that this general "usage of trade" tends to support the inference that CDCR would do likewise here and direct payment to Karan's client trust account. (*Id*.).

In response, CDCR first denies that any extrinsic evidence can be admitted interpreting or modify the Settlement Agreement. (Doc. No. 122 at 3). As an initial matter, the Court rejects this argument. It is well-settled that under the specific circumstances established here—where a

14

1  material term of a contract is found by the court to be silent or ambiguous—the court may look to
2  extrinsic evidence to supply the missing term.  *See, e.g., WYDA Assocs.*, 42 Cal.App.4th at 1710.
3  The question is what conclusion results from a review of that extrinsic evidence.  CDCR cites one
4  recent settlement agreement involving a represented, *incarcerated* plaintiff (*Abel P. Reyes v. M.*
5  *Flores, et al*., 1:16-cv-00586-CDB), which was drafted by Defense counsel, and did not provide
6  for payment to the attorney's client trust account.  CDCR implies that this belies Mr. Karan's
7  claim that CDCR has an established practice of sending settlement checks to an attorney's client
8  trust account.  The example cited, however, is factually distinct because it involves an
9  incarcerated plaintiff rather than a parolee, and only tends to support a claim that defense counsel
10 follows a particular practice with regards to settlement agreements.  CDCR asserts "it is common
11 practice for CDCR to issue settlement payments directly to inmates and parolees, including in
12 cases [where] an *inmate* is represented by an attorney."  (Doc. No. 122 at 4) (emphasis added).
13 Notably, CDCR does not assert that "it is common practice" to issue settlement payments directly
14 to *represented parolees*, nor does CDCR does not cite a single example where the agency sent a
15 settlement check directly to a parolee who was represented by retained (as opposed to appointed
16 pro bono counsel) as it did here.  Weighed against the nine settlement agreements cited by Karan,
17 spanning more than 20 years and presumably several different defense attorneys representing
18 CDCR defendants, the Court infers that the far more common practice in a case involving a
19 represented parolee is to send payment to the attorney.  Moreover, Mr. Roman's communications
20 with Mr. Karan concerning the whereabouts of the settlement check ("If *you* have not received it,
21 *you* should receive it in the next week.  Please let me know once *you* get it") (emphasis added)
22 tend to support the inference that Roman himself thought the check would be sent to Karan.
23 Given the amount of the check ($225,000.00), this seems like a particularly reasonable
24 presumption.
25       Indeed, Karan is correct that the accepted practice in liability actions involving payment
26 of a settlement by a third party is to deliver the settlement payment to the claimant's attorney.  As
27 the American Bar Association has stated:
28       In payment of liability claims, it is the customary practice of

> insurance carriers to deliver the settlement proceeds to the lawyer of record for the claimant, usually by check made payable jointly to the claimant and the claimant's lawyer. As the Supreme Court of New Jersey observed in *Matter of Conroy*, 56 N.J. 279, 266 A.2d 279 (1970), the underlying purpose for the practice is to "protect and preserve the interests of all three parties to the transaction" the insured, the successful claimant and the claimant's lawyer.

Appendix D. Model Rule for Payee Notification, Legal Ethics, Law. Deskbk. Prof. Resp. App. D (2023-2024 ed.). While CDCR is not an insurance carrier, the agency's relationship to Plaintiff is very similar to that between a carrier and a claimant. In prisoner civil rights litigation CDCR is generally the entity bearing financial responsibility for its employees' legal violations and thus for paying monetary settlements to resolve them. This is essentially the same role an insurance carrier plays with respect to damages incurred by its policy holders. Thus, the customs prevailing in the insurance industry are properly applied in the context of prisoner civil rights litigation. Here, CDCR's actions were contrary to the prevailing custom in the applicable area of law and thus the implied terms of the settlement agreement.

**D. Conclusion**

Based on the analysis above, the Court finds that the Settlement Agreement between Plaintiff and CDCR was ambiguous as to the manner of payment. The Agreement required that both Plaintiff and his attorney submit Payee Data Records, suggesting at a minimum that payment would be issued to both. In its briefing, CDCR failed to address this language or reconcile it with the Agency's position that the Agreement was clear and unambiguous that the $225,000.00 settlement proceeds would be sent directly to Plaintiff and made payable exclusively to him. In fact, the Agreement lacked any language specifying to whom or how payment would be made. Looking to the relevant extrinsic evidence, the Court finds the most reasonable interpretation of the ambiguous payments language in the Agreement is that the Parties intended for payment to be sent to Mr. Karan so that he could deduct his legal fees and costs and satisfy Plaintiff's debts related to the case. This is supported by several prior settlement agreements cited by Mr. Karan where CDCR followed this practice, and it conforms to the general industry practice in personal injury actions of paying settlement proceeds to an attorney. The fact that in his communications with Mr. Karan, Mr. Roman appeared to believe payment would be sent to Mr. Karan further

supports this interpretation.

Accordingly, it is hereby **ORDERED**:

1. Plaintiff's Motion to Enforce the Settlement Agreement (Doc. No. 99) is **GRANTED IN PART** to the extent set forth herein. The Court does not rule at this time on the amount of any damages owed by CDCR to Plaintiff's counsel.
2. Plaintiff's Counsel is directed to file a document outlining his damages resulting from CDCR's breach of the Settlement Agreement, supported where possible with documentary evidence, including his retention agreement with Plaintiff. The Court will issue a ruling thereafter concerning the amount of any damages owed by CDCR.

Dated:   July 12, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE